# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

April 8, 2020

**Via ECF and Email**
The Honorable Allyne R. Ross
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    **United States v. William Sawicz, 08-CR-287 (ARR)**
             Emergency Motion for Compassionate Release Due to COVID-19 Outbreak at
             FCI Danbury

Your Honor:

      William Sawicz, through undersigned counsel, respectfully moves the Court under 18

U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to home

confinement until his February 26, 2021 release date, to be followed by the already-imposed five

year term of supervised release. The unprecedented threat of COVID-19 could not have been

foreseen at sentencing, and poses extraordinary risks to Mr. Sawicz's health.

      Attorney General Barr has recognized that FCI Danbury, where Mr. Sawicz is housed, is

one of three federal prisons "most affected by COVID-19," and that the virus is "an emergency

condition" that is "materially affecting operations" in that facility. Exhibit A at 1–2 (Attorney

General William Barr, *Memorandum for Director of Prisons Re: Increasing Use of Home

Confinement at Institutions Most Affected by COVID-19*, Apr. 3, 2020). At the time of this

writing, according to the BOP's public website, 28 inmates and 12 staff members at the facility

have tested positive for COVID-19.[1]  The virus thrives in densely packed populations.  FCI Danbury has proven that it is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Mr. Sawicz.

Mr. Sawicz is especially vulnerable to the threat of COVID-19, because he suffers from diagnosed hypertension, for which he takes prescribed Lisinopril and baby aspirin.  People with hypertension treated by ACE inhibitors, such as Lisinopril, "are at higher risk for severe COVID-19 infection,"[2] as confirmed by the Centers for Disease Control and Prevention.[3]  Allowing Mr. Sawicz to finish out his sentence at home is the only prudent response to the extraordinary and compelling circumstances created by the rampant spread of the novel coronavirus at FCI Danbury, especially given that Mr. Sawicz has already served the vast majority of his five-year sentence.

## I.     Procedural History

On August 23, 2016, this Court sentenced Mr. Sawicz to five years of imprisonment[4] on

---

[1] *BOP: COVID-19 Update*, Federal Bureau of Prisons (Apr. 7, 2020) *at* https://www.bop.gov/coronavirus/.

[2] Lei Fang, George Karakiulakis, Michael Roth, *Are Patients With Hypertension and Diabetes Mellitus at Increased Risk for COVID-19 Infection?*, The Lancet (Mar. 11, 2020), *at* https://www.thelancet.com/pdfs/journals/lanres/PIIS2213-2600(20)30116-8.pdf.

[3] *Moribidity and Mortality Weekly Report: Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 — United States, February 12–March 28, 2020*, Centers for Disease Control and Prevention (Apr. 3, 2020), *at* https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm.

[4] The five-year mandatory minimum in 18 U.S.C. § 3583(k) does not play any role in a compassionate release motion.  18 U.S.C. § 3582(c)(1)(A)(i) does not place any such limit on bringing a motion, and courts have granted compassionate release in cases in which the defendant had not yet served the mandatory minimum term.  *E.g.*, *United States v. Rodriguez*, 2020WL162733 at *12 (E.D.N.Y. Apr. 1, 2020), 103-CR-271 (AB) (granting compassionate release due to COVID-19 for defendant who served seventeen years on a twenty-year mandatory minimum, who, with good conduct time, was a year and a half away from release).

a violation of supervised release, stemming from his new possession of child pornography, committed in the sixth year of a seven-year term.[5]  Mr. Sawicz was designated to FCI Danbury, where he self-surrendered, and has served his entire sentence.  Mr. Sawicz was approved by his unit manager for transfer to a halfway house, and his application was submitted to the New York Residential Reentry Office on December 28, 2019.  Several months ago, United States Probation Officers conducted a home visit at Mr. Sawicz's parents' home in Deer Park, New York, where he resided on home detention while on bond, and approved the residence for his reentry.  On March 31, 2020, the Residential Reentry Office confirmed that Mr. Sawicz's application was received, was "being processed at this time," and "that's all the information available at this time."  Exhibit B (email from Maria Figueroa, Residential Reentry Oversight Specialist).

Under the ordinary six-month limit for home confinement, pursuant to 18 U.S.C. § 3624(c)(2), Mr. Sawicz would be eligible for administrative transfer to his home by the BOP, without court action, on August 26, 2020.  But Section 12003(b)(2) of the Coronavirus Aid Relief and Economic Security (CARES) Act extended that time frame, and on April 3, 2020, Attorney General Barr directed that the BOP "immediately maximize appropriate transfers to home confinement of all appropriate inmates held at . . . FCI Danbury."  Exhibit A at 1.  His directive applied to "all at-risk inmates—not only those who were previously eligible for transfer."  *Id.* at 2.  On April 5, 2020, Mr. Sawicz, through counsel, submitted a letter to FCI Danbury Warden Williams formally requesting transfer to home confinement pursuant to these

---

[5] Mr. Sawicz was indicted on the new charges in 15-CR-443 (ARR).  The parties entered into a 48-month Deferred Prosecution Agreement on that indictment, which the Court approved.  The terms of the agreement state that it takes effect upon his release from BOP custody.  See ECF No. 49-1.  Thus, if he were to be released early by the grant of this motion, that period would begin to run.

provisions and directives.  Exhibit C (email to Warden); *see* ECF No. 61.[6]  As of today, April 8,

2020, no response has been received by counsel from the facility, and though others have been

either released or moved to pre-release quarantine, Mr. Sawicz has received no information

regarding his application.

## II.      Mr. Sawicz's Current Conditions of Confinement and Health Conditions

By their nature, prisons are infectious disease vectors, as individuals are held in close

quarters, without any ability to practice social distancing or other preventative measures.  As

explained, FCI Danbury is being hit particularly hard by the virus.  And Mr. Sawicz is especially

vulnerable to the threat of COVID-19.  While at FCI Danbury, he was diagnosed with

hypertension.[7]  Doctors at the facility prescribed him daily Lisinopril and baby aspirin, which he

takes as directed.  People with hypertension treated by ACE inhibitors, such as Lisinopril, "are at

higher risk for severe COVID-19 infection," as confirmed by the Centers for Disease Control

and Prevention.[8]  Mr. Sawicz reports that many inmates on his housing unit have developed

symptoms consistent with COVID-19, and every day, from his window, he can see inmates

being moved into the COVID-19 quarantine unit.

---

[6] The BOP website directs that "while all inmates are being reviewed for suitability [for expanded home confinement], any inmate who believes they are eligible may request to be referred to Home Confinement and provide a release plan to their Case Manager."  *Update on COVID-19 and Home Confinement*, Federal Bureau of Prisons (Apr. 5, 2020), *at* https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp.  But due to the quarantine of all inmates across the BOP, Mr. Sawicz confirmed to me that he had not had access to his Case Manager in over one week, so could not follow that procedure.  Accordingly, I filed the letter on his behalf.

[7] Due to the current crisis, I am unable to access Mr. Sawicz's medical records within the BOP. It is my understanding that the government can confirm this information with the facility.

[8] *See* n.2 and n.3.

**III.    Under the First Step Act, this Court has Broad Authority to Determine Whether Extraordinary and Compelling Circumstances Exist to Modify Mr. Sawicz's Sentence and Release Him to Home Confinement.**

The First Step Act ("FSA") expressly permits Mr. Sawicz to move this Court to seek compassionate release, by which this Court may reduce his term of imprisonment, and order that he serve the balance of the term on home confinement as a special condition of an amended judgment.  *See* 18 U.S.C. § 3583(c)(1)(A)(i).  Under normal circumstances, a defendant can seek recourse through the courts after either (1) the BOP declines to file such a motion on his behalf; or (2) there has been of lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier.  *Id.*  As indicated, on April 5, 2020, undersigned counsel transmitted Mr. Sawicz's request to the warden of FCI Danbury via email.[9]  Although the BOP has yet to rule on the request (and thirty days have yet to pass), Mr. Sawicz files this motion now in light of the urgent nature of this matter.  *See infra* Part III. A.

After exhausting the administrative process, "a court may then 'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'"  *United States v. Ebbers*, 2020 WL 91399, at *4, 02-CR-1144 (VEC) (ECF No. 384) (S.D.N.Y. Jan. 8, 2020).  "In making its decision, a court must also consider 'the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable.'" *Id.* (*quoting* 18 U.S.C. § 3582(c)(1)(A)).

---

[9] It is true that Mr. Sawicz's request to the warden was to be transferred to home confinement, pursuant to 18 U.S.C. § 3624(c)(2), for which he is eligible due to the CARES Act and Attorney General Barr's directives, rather than expressly for compassionate release pursuant to 18 U.S.C. § 3583(c)(1)(A)(i).  Both forms of relief are requested via a letter to the warden, seeking the same relief (release to home confinement) for the same exceptional reason (the imminent danger of COVID-19).  Since the facility has not responded to the home confinement request, sending a second letter to the same office, making the same argument, would be necessarily futile.

While courts have noted that the Sentencing Commission's applicable policy statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA, they still continue to be guided by the Sentencing Commission's descriptions of "extraordinary and compelling reason." *See, e.g.*, *Ebbers*, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020).  However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in light of the First Step Act's amendments.  *United States v. Beck*, 2019 WL 2716505, at *5–6 (M.D.N.C. June 28, 2019); *see also Ebbers*, 2020 WL 91399, at *4.  Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release."  *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) (collecting cases).

### A. The unprecedented nature of this emergency compels the Court to find the exhaustion requirement waived.

The Court need not and should not wait for Mr. Sawicz to exhaust administrative remedies under § 3582(c)(1)(A), as this will almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons, while posing a particular and real danger to Mr. Sawicz.  *See generally Washington v. Barr*, 925 F.3d 109, 120–21 (2d Cir. 2019) ("[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile.").

Federal courts have found that they can hear compassionate release applications prior to the expiration of 30 days (or the exhaustion of administrative remedies) if there is an emergency. *E.g., United States v. James Arberry*, No. 15 Cr. 594 (JPO), ECF Docket No. 84 (S.D.N.Y. Nov. 12, 2019) (hearing and granting emergency compassionate release application of prisoner with cancer).  Specifically, courts across the country, and within this Circuit, have so held on the basis

6

of the COVID-19 pandemic.  *See United States v. Perez*, 17-CR-513 (AT) (S.D.N.Y.), ECF No.

98 (Apr. 1, 2020) (finding three exceptions to exhaustion applicable: (1) futility; (2) where the

administrative process is incapable of providing the requested relief; (3) where the defendant is

subjected to undue prejudice), *see also United States v. Zukerman*, 16-CR-194 (AT) (S.D.N.Y.) ,

ECF No. 116 (Apr. 3, 2020) (same); *United States v. Colvin*, No. 19-CR-179, 2020 WL

1613943, at *2 (D. Conn. Apr. 2, 2020) (waiving exhaustion); *United States v. Powell*, 94 Cr.

316 (D.D.C.), ECF. No. 98 (Mar. 28, 2020) (same); *United States v. Huneeus*, 19-CR-10117 (D.

Mass), ECF No. 642 (Mar. 17, 2020) (same).

These decisions waiving exhaustion accord with general administrative law principles

and the exception to administrative exhaustion requirements in numerous statutory schemes.

*See, e.g., Hendricks v. Zenon*, 993 F.2d 664, 672 (9th Cir. 1993) (waiving requirement to exhaust

administrative remedies where "exceptional circumstances of peculiar urgency are shown to

exist") (*citing Granberry v. Greer*, 481 U.S. 129 (1987)); *Washington v. Barr*, 925 F.3d 109, 119

(2d Cir. 2019) (finding that administrative exhaustion requirements can be waived if delay would

cause irreparable injury); *Maxwell v. New York Univ.*, 407 F. App'x 524, 527 (2d Cir. 2010)

(same).

"[A]pplication of the exhaustion doctrine is 'intensely practical'" and should "be guided

by the policies underlying the exhaustion requirement."  *Bowen v. City of New York*, 476 U.S.

467, 484 (1986) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 n.11 (1976)).  Those policies

were articulated by the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749 (1975): "Exhaustion

is generally required as a matter of preventing premature interference with agency processes, so

that the agency may function efficiently and so that it may have an opportunity to correct its own

errors, to afford the parties and the courts the benefit of its experience and expertise, and to

compile a record which is adequate for judicial review."  422 U.S. at 765.

Conducting an "intensely practical" analysis of these policies in the context of the Social Security Act's exhaustion requirement, the Supreme Court held in *Bowen* that courts "should be especially sensitive" to irreparable and severe medical harm resulting for blind adherence to a statutory exhaustion requirement, particularly "where the Government seeks to require claimants to exhaust administrative remedies merely to enable them to receive the procedure they should have been afforded in the first place."  476 U.S. at 484 (discussing 42 U.S.C. § 405(g)); *see also Rafeedie v. I.N.S.*, 880 F.2d 506 (D.C. Cir. 1989) (Ginsburg, J., concurring) ("As I see it, a statutory exhaustion requirement, unless Congress explicitly declares otherwise, does not impose an absolute, unwaivable limitation on judicial review; instead, it sets a condition that may be excused when insistence on exhaustion would threaten grave harm to the party seeking review and would not sensibly serve the purposes Congress envisioned in establishing that condition.").

When coupled with the impending crisis, the unique exhaustion provision in § 3582(c)(1)(A) places this case squarely within *Bowen*'s holding.  Under § 3582(c)(1)(A), waiving exhaustion will "merely [ ] enable [Mr. Sawicz] to receive the procedure [he] should have been afforded in the first place"—it will simply advance by what could be a crucial twenty-seven days this Court's consideration of Mr. Sawicz's motion for compassionate release.  *Bowen*, 476 U.S. at 484.  To wit, § 3582(c)(1)(A) provides that motions for compassionate release are to be brought *either* by the "Director of the Bureau of Prisons, *or* upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . ."  18 U.S.C. § 3582(c)(1)(A) (emphasis added).  In other words, § 3582(c)(1)(A)'s exhaustion requirement is not like other statutory exhaustion requirements, which expressly deprive federal courts of jurisdiction to hear

8

disputes in the absence of exhaustion. *Cf. Booth v. Churner*, 532 U.S. 731, 736 (2001) (failure to exhaust under the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), means action cannot be maintained in federal court because that provision explicitly provides that "*[n]o action shall be brought* with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." (emphasis added)). Rather, § 3582(c)(1)(A) merely controls who (the BOP or the Defendant) moves for compassionate release before the Court, and when (now, or long after COVID-19 has already swept even more widely throughout FCI Danbury than it already has).

Congress' desire to avoid blind adherence to this "exhaustion" requirement is evidenced by the exception baked into § 3582(c)(1)(A), which provides that Defendants can bypass exhaustion altogether if the warden fails to act on an administrative application for compassionate release within 30 days. § 3582(c)(1)(A) ("[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility*, whichever is earlier . . . ." (emphasis added)). With this provision, Congress implicitly recognized that the policies underlying compassionate release are not furthered—and, indeed, actively frustrated—by excessive deference to bureaucratic process. Congress' concerns about delay are even more pronounced in the current public health crisis.

The policies underlying such requirements would not be furthered by strict adherence in this instance. Giving the BOP time to decide administrative applications for compassionate release predicated on COVID-19 concerns would not "afford the parties and the courts the

benefit of [the BOP's] experience and expertise." *Salfi*, 422 U.S. at 765.  The BOP already has

provided its "expert" input on such requests: its "COVID-19 Action Plan" lacks any

consideration whatsoever of compassionate release.  *See* Federal Bureau of Prisons COVID-19

Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.  And

specifically as to Mr. Sawicz, FCI Danbury has not so much as acknowledged receipt of his

request for home confinement, an arguably lower bar to relief than compassionate release.  Thus,

it would be futile to force Mr. Sawicz to exhaust his administrative remedies—at the cost of his

health and, potentially, his life.

COVID-19 has already begun to spread like wildfire in FCI Danbury.  Already, as of

April 7, 2020, 28 inmates have tested positive, as well as twelve staff members.  *See* n.1.  The

facility only houses 746 inmates, and the spread has been rapid—on April 6, 2020, the website

showed 21 positive inmates.  With the speed and unpredictability of this pandemic in the facility,

recognized by the Attorney General as one of the three worst hit in the entire BOP, Exhibit A,

waiting even twenty-seven days will be too late.  Accordingly, this Court should exercise

jurisdiction over Mr. Sawicz's emergency motion for compassionate release and dispense with

the BOP requirements under 18 U.S.C. § 3582(c)(1)(A)(i).

### B. "Extraordinary and compelling reasons" warrant a reduction in Mr. Sawicz's sentence.

The COVID-19 pandemic continues to roil the United States, and FCI Danbury in

particular.  As of April 8, 2020, the United States has 418,185 confirmed positive cases and has

had 14,257 deaths.[10]  There have been 241 inmate positives, 28 within FCI Danbury, and eight

---

[10] *Coronavirus in the U.S.: Latest Map and Case Count*, The New York Times (Apr. 8, 2020), *at* https://nyti.ms/2UIkCz4.

deaths within the Bureau of Prisons.[11]  The numbers are likely higher, as testing is limited.  *See,*

*e.g.*, *In the Matter of the Extradition of Manrique*, 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19,

2020) (expressing concern about the infection rate within BOP facilities given that "people are

not being tested").  Information and statistics that BOP provided to Congress on April 7, 2020,

reflect that 456 people are in isolation due to being symptomatic, and 3,850 inmates are in

quarantine.

Conditions of confinement create an ideal environment for the transmission of highly

contagious diseases like COVID-19.[12]  In jails, "[t]he probability of transmission of potentially

pathogenic organisms is increased by crowding, delays in medical evaluation and treatment,

rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise."

*Id.*  Though the BOP purports to be screening inmates, as the *Manrique* Court put it: "the [BOP]

management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14

days after exposure, so screening people based on observable symptoms is just a game of catch

up. . . .  We don't know who's infected."  *Manrique*, 2020 WL 1307109, at *1.

Mr. Sawicz is particularly vulnerable to COVID-19, due to his ACE inhibitor-managed

hypertension at a facility overrun with the disease.  This is an "extraordinary and compelling

reason" for his release.  *See* Note 1(A), § 1B1.13 (expressly recognizing that "other reasons"

may exist for granting compassionate release), *see* Note 1(D), § 1B1.13 Note 1(D) (recognizing

that extraordinary and compelling reasons exists "other than, or in combination with, the reasons

described in subdivisions (A) through (C).").  Here, Mr. Sawicz's high susceptibility to

---

[11] *See* n.1.

[12] *See* Joseph A. Bick (2007). *Infection Control in Jails and Prisons. Clinical Infectious Diseases*
45(8):1047-1055, *at* https://academic.oup.com/cid/article/45/8/1047/344842.

complications should he contract COVID-19 (if he has not already) falls within the purview of this catchall.  Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there.  Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release.  Given the highly infectious nature of COVID-19, the demonstrated failure of FCI Danbury to stop the spread, the inability of Mr. Sawicz to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that he suffers from an ailment that renders him at higher risk, this Court should find that Mr. Sawicz's legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

### IV.    Mr. Sawicz Has A Stable Home To Live In, if Released To Home Detention, Where He Will Be Safer and The Public Will Be Safe.

If released to home confinement, Mr. Sawicz will not be completely at liberty; he will be confined to his parents' home, just as he was while out on bond pretrial in this matter.  He will remain so confined until the end of his sentence, regardless of the hopeful passage of the threat of the virus.  I have spoken with Martin and Marie Sawicz, and they have confirmed that Mr. Sawicz is welcome to return home, and they are eager for him to do so.  The family lives in a 2,250 square foot, two bedroom, single-family home, in Deer Park, NY, which has already been approved for Mr. Sawicz as his reentry residence by the United States Probation Department. Thankfully, neither of Mr. Sawicz's parents are experiencing COVID-19 symptoms, unlike many of these people with whom he is in close contact at FCI Danbury.  His parents, who are readily available by telephone, are willing to have Mr. Sawicz come home now, and quarantine at home (where he will remain, full time, if this application is granted), rather than at the facility.

Undoubtedly, Mr. Sawicz will be better able to practice social distancing and handwashing at his parents' home than inside of a federal prison.  And should he become afflicted, he will be far more able to access quality medical care in the community than within this prison.

Mr. Sawicz presents no risk of flight or danger that outweigh the risks to his health of remaining in prison while this pandemic ravages through its walls.  Mr. Sawicz accrued zero pretrial violations, and completed six years of supervised release, without a violation, before the instant offense.  He has never been accused of committing any act of violence.  He is already eligible for transfer into the community, and absent the delays presented by the pandemic, would almost certainly already have a halfway house transfer date.  And he is eligible for home detention via the CARES Act and Attorney General Barr's directives, and should be home already, if the BOP were willing to comply with its obligations.  This Court should step in to protect Mr. Sawicz's health, and perhaps, without exaggeration, to save his life.

## V.    Conclusion

For the foregoing reasons, Mr. Sawicz respectfully requests that the Court modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) and release him to home confinement or, in the alternative, hold a telephonic hearing as soon as possible.  Should the Court wish to hold a hearing, counsel waives Mr. Sawicz's appearance, upon his consent.

Thank you for your consideration of this motion.  I have enclosed a proposed Order for the Court's consideration.

Respectfully submitted,

_____/s/_____
Mia Eisner-Grynberg, Esq.
Assistant Federal Defender
(914) 355-6493

cc:    AUSA Nomi Berenson (by email and ECF)

# **<u>EXHIBIT A</u>**



# Office of the Attorney General
## Washington, D. C. 20530

April 3, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU OF PRISONS

FROM:          THE ATTORNEY GENERAL

SUBJECT:       <u>Increasing Use of Home Confinement at Institutions Most Affected by
               COVID-19</u>

The mission of BOP is to administer the lawful punishments that our justice system imposes. Executing that mission imposes on us a profound obligation to protect the health and safety of all inmates.

Last week, I directed the Bureau of Prisons to prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses to our vulnerable inmates, while ensuring we successfully discharge our duty to protect the public. I applaud the substantial steps you have already taken on that front with respect to the vulnerable inmates who qualified for home confinement under the pre-CARES Act standards.

As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below.

I.   <u>**IMMEDIATELY MAXIMIZE APPROPRIATE TRANSFERS TO HOME CONFINEMENT OF ALL APPROPRIATE INMATES HELD AT FCI OAKDALE, FCI DANBURY, FCI ELKTON, AND AT OTHER SIMILARLY SITUATED BOP FACILITIES WHERE COVID-19 IS MATERIALLY AFFECTING OPERATIONS**</u>

Memorandum from the Attorney General                                               Page 2
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

While BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions. I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations. You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems. And now that I have exercised my authority under the CARES Act, your review should include all at-risk inmates—not only those who were previously eligible for transfer.

For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred. It is vital that we not inadvertently contribute to the spread of COVID-19 by transferring inmates from our facilities. Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations.

I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community. I therefore authorize BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety.

Given the speed with which this disease has spread through the general public, it is clear that time is of the essence. Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress.

## II.   **PROTECTING THE PUBLIC**

While we have a solemn obligation to protect the people in BOP custody, we also have an obligation to protect the public. That means we cannot simply release prison populations en masse onto the streets. Doing so would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses.

That risk is particularly acute as we combat the current pandemic. Police forces are facing the same daunting challenges in protecting the public that we face in protecting our inmates. It is impossible to engage in social distancing, hand washing, and other recommend steps in the middle of arresting a violent criminal. It is thus no surprise that many of our police officers have fallen ill with COVID-19, with some even dying in the line of duty from the disease. This pandemic has dramatically increased the already substantial risks facing the men and women who keep us safe, at the same time that it has winnowed their ranks while officers recover from getting sick, or self-quarantine to avoid possibly spreading the disease.

Memorandum from the Attorney General                                            Page 3
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates. Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context.

I believe strongly that we should do everything we can to protect the inmates in our care, but that we must do so in a careful and individualized way that remains faithful to our duty to protect the public and the law enforcement officers who protect us all.

# **EXHIBIT B**

## Mia Eisner-Grynberg

**From:** Maria Figueroa <mefigueroa@bop.gov>
**Sent:** Tuesday, March 31, 2020 11:01 AM
**To:** Mia Eisner-Grynberg
**Subject:** Re: William Sawicz

It is being processed.  We received it.  That's all the information available at this time....

g <Mia_Eisner-Grynberg@fd.org> 3/29/2020 4:11 PM >>>
Hello,

Fully understanding all of our backlog, would you be able to check the status of

WILLIAM JOSEPH SAWICZ
**Register Number**: 75670-053

Thank you!

Mia Eisner-Grynberg
Assistant Federal Defender
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
(718) 330-1257
(718) 855-0760 (FAX)
Mia_Eisner-Grynberg@fd.org

# **EXHIBIT C**

**Mia Eisner-Grynberg**

| | |
|---|---|
| **From:** | Mia Eisner-Grynberg |
| **Sent:** | Sunday, April 5, 2020 3:22 PM |
| **To:** | 'DAN/ExecAssistant@bop.gov' |
| **Cc:** | Rachel Bass; Deirdre Vondornum |
| **Subject:** | Attn: Warden - CARES Home Confinement Request - William Sawicz #75670-053 |
| **Attachments:** | Williams Sawicz Warden Letter Home Confinement.pdf |

Dear Warden Williams,

Attached please find a request for the transfer of William Sawicz, Reg. No. 75670-053, to home confinement, per the directive of AG Barr to so release all appropriate, at-risk inmates from FCI Danbury.

I can be reached at (914) 355-6493 or this email address with any questions or concerns.  I appreciate your prompt attention to this time-sensitive matter.

Best,

Mia Eisner-Grynberg
Assistant Federal Defender
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
(718) 330-1257 (Office)
(914) 355-6493 (Cell)
(718) 855-0760 (Fax)
Mia_Eisner-Grynberg@fd.org